**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1398-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

HAKEEM S. ELEY,

    Defendant-Appellant.

_____

> Argued June 1, 2022 – Decided June 28, 2022
>
> Before Judges Fisher, DeAlmeida and Smith.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 16-10-2896 and 18-06-1770.
>
> Cody T. Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody T. Mason, of counsel and on the briefs).
>
> Emily M. M. Pirro, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Emily M. M. Pirro, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant, Hakeem S. Eley, was convicted of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and fourth-degree possession of hollow nose or dum-dum bullets, N.J.S.A. 2C:39-3(f). He was sentenced to nine years' incarceration, subject to a four-and-a-half-year period of parole ineligibility.

On appeal, defendant argues the following points:

POINT I

> THE COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO VOIR DIRE THE JURY AFTER JUROR NUMBER SEVEN BELATEDLY REVEALED THAT HE COACHED SOCCER NEAR THE AREA OF THE INCIDENT ALMOST EVERY DAY, HAD MULTIPLE FAMILY MEMBERS IN THE NEWARK POLICE DEPARTMENT, AND WAS FRIENDS WITH ONE OF THE ARRESTING OFFICERS.

POINT II

> THE COURT UNFAIRLY LIMITED THE DEFENSE WHEN IT REFUSED TO INSTRUCT THE JURY THAT CABEZAS'[] PRIOR CONTRADICTORY STATEMENTS COULD BE USED FOR THEIR SUBSTANCE, AND BARRED TESTIMONY SUGGESTING THAT THE GUN COULD HAVE BEEN LEFT IN THE ALLEY AS A "COMMUNITY GUN."

A-1398-19

POINT III

> THE PROSECUTOR ENGAGED IN REVERSIBLE MISCONDUCT WHEN HE BOLSTERED THE OFFICERS' CREDIBILITY BASED ON THEIR STATUS AS POLICE OFFICERS, DISPARAGED THE DEFENSE, AND INVOKED THE NUREMBERG TRIALS.

POINT IV

> THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL SUCH THAT HIS TRIAL CONVICTIONS SHOULD BE REVERSED AND HIS GUILTY PLEA SHOULD BE VACATED.

POINT V

> RESENTENCING IS REQUIRED BECAUSE THE NEAR-MAXIMUM NINE-YEAR SENTENCE WAS MANIFESTLY EXCESSIVE AND BASED ON FLAWED AND INCONSISTENT FINDINGS.

We are not persuaded by defendant's challenge to the exclusion of testimony on his "community gun" theory. However, we conclude that the State's summation exceeded the limits on permissible comments. We also find that the trial court erred by (1) failing to voir dire additional jurors when a juror with extraneous information was dismissed mid-trial, and (2) failing to properly instruct the jury on prior inconsistent statements given by a police officer

3

involved in defendant's arrest. For these reasons, we are constrained to vacate the judgment of conviction and remand the matter for a new trial.

## I.

Facts and Procedural History

The facts leading to defendant's arrest and conviction as developed at trial are summarized as follows. On July 11, 2016, two plain-clothes Newark police officers, Onofre Cabezas and Roger Mendes, were in an unmarked van when they saw a black BMW pull up about fifty feet ahead of them. The officers saw a man, later identified as defendant, exit the front passenger seat of the BMW, walk down the sidewalk, and pull on the door handle of a parked car.

The officers thought defendant's behavior was suspicious because there had been "prior burglaries into autos" in that location, so they decided to approach and investigate. According to the officers, when defendant noticed them approaching, he pulled "a black large handgun" out of his sweatpants and began to run. Both officers followed in pursuit and, allegedly, Officer Cabezas saw defendant throw the gun before being apprehended.

On October 18, 2016, an Essex County grand jury indicted defendant (Indictment I) with second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-3(d);

4

fourth-degree possession of hollow nose or dum-dum bullets, N.J.S.A. 2C:39-3(f); as well as fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2).

Defendant moved to suppress evidence. Officer Cabezas testified at the suppression hearing. The motion was denied on June 12, 2017.

On June 8, 2018, defendant was indicted on separate charges (Indictment II). He was charged, along with two others, with second-degree conspiracy to distribute a controlled dangerous substance (CDS), N.J.S.A. 2C:5-2; two counts of third-degree possession of CDS, N.J.S.A. 2C:35-10(a); two counts of third-degree possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1)-b(3); and two counts of second-degree possession of CDS with intent to distribute within 500 feet of public housing, a public park, or a public building, N.J.S.A. 2C:35-7.1(a).

Defendant's trial on Indictment I began on May 1, 2019. After presenting its case-in-chief, the State dismissed the fourth-degree possession of a defaced firearm charge. During the trial the State called several witnesses. Both Officer Cabezas and Officer Mendes testified. Additionally, the State presented Officer Roderick Brown, the identification officer who processed the crime scene and weapon for DNA and fingerprints, and Kimberly Michalik, a DNA analyst who testified that the swab collected from the gun did not contain sufficient DNA for

A-1398-19

comparison purposes. The State also called an assistant Essex County prosecutor, Michael Morris. Morris testified that he returned the recovered gun to its deceased owner's widow.[1] Because the gun was returned, the gun itself was not presented at trial. Nor were the bullets.

The jury deliberated on May 2, May 3, and May 6, and was initially deadlocked on two counts. On May 6, the jury convicted defendant of second-degree unlawful possession of a handgun and fourth-degree possession of hollow nose or dum-dum bullets, but acquitted him of fourth-degree resisting arrest. In June 2019, the trial judge sentenced defendant to an aggregate nine years of incarceration with four-and-a-half years' parole ineligibility for Indictment I. On Indictment II, the judge imposed a concurrent five-year term, with corresponding fines.[2] All other charges were dismissed. This appeal followed.

---

[1] Testimony from Morris revealed that the registered owner of the firearm was the late Patrick Kimmel and the weapon, according to the file produced to Morris, was stolen from his home in Fayetteville, North Carolina in 2008.

[2] Defendant resolved Indictment II by pleading guilty to third-degree conspiracy and two counts of third-degree possession of CDS with intent to distribute. In exchange, the State recommended a sentence of a concurrent five-year term of incarceration.

## II.

### The Community Gun Theory

At the outset, we are not persuaded by defendant's argument that barring testimony on "community guns" precipitated an unfair trial by preventing him from developing an alternate theory as to the gun's provenance. On cross-examination of Officer Cabezas, defense counsel attempted to present the theory that the gun recovered was not defendant's, as it did not have his fingerprints or DNA on it, but actually a "community gun" left in the high-crime, gang-affiliated area. The State objected to this line of questioning and the court found the questions "hing[ed] on [the] hypothetical" and were "beyond the scope of direct." In sustaining the objection, the court found defendant could be subjected to negative inferences about gang affiliation if the jury heard the testimony.

Trial courts are afforded broad discretion in controlling cross-examination. State v. Jenewicz, 193 N.J. 440, 467 (2008). See State v. Sands, 76 N.J. 127, 140 (1978) ("a trial judge has broad discretion in controlling the scope of cross-examination"). Pursuant to N.J.R.E. 611(b), cross-examination should "not go beyond the subject matter of the direct examination and matters affecting the witness' credibility." And it is well settled "[t]hat the scope of

7

cross-examination is a matter for the control of the trial court and an appellate court will not interfere with such control unless clear error and prejudice are shown . . . ." State v. Wakefield, 190 N.J. 397, 452 (2007).

We cannot conclude that the court erred in excluding the community gun testimony during trial. As the court pointed out, the community gun line of questioning was hypothetical, it was not based on evidence in the case or previous testimony. The court also noted the risk of prejudice stemming from gang related testimony; specifically, the possibility that the jury could make an inference that defendant was involved or associated with a gang. Moreover, defendant was still able to present the theory that he was not the source of the gun. Defense counsel elicited testimony that guns were frequently found in the area, and that the recovered gun could have been abandoned or put there by someone else.

The court's exercise of discretion over the community gun testimony did not prevent defendant from presenting a full defense. We do not find, based on this record, that the judge clearly erred and prejudiced the defendant by barring testimony on community guns.

A-1398-19

III.

The State's Improper Summation

During closing arguments, defense counsel urged the jury to look at "the consistency of the evidence," and emphasized that "Cabezas was inconsistent with his prior testimony on multiple occasions." Defense counsel also highlighted the State's failure to preserve critical evidence in this case, including the weapon, the bullets, and the statements of a witness at the scene. Counsel discussed the lack of forensic evidence such as fingerprints or DNA, and ultimately concluded his summation by saying:

> if you find inconsistencies in the testimony of the State, if you think they [bungled] the collection of evidence, if you think that they fabricated testimony like I believe Cabe[z]as did, there's only one thing you can do while following your oath, find him not guilty.

The State followed, arguing in part:

> So [Cabezas] jeopardized his own neck out there, chasing a man he knew to be armed. He risked his own life doing that. Yet [defense counsel] would criticize him for the actions he took, the jeopardy he placed himself in. . . . We send these officers out to jeopardize their lives every day. And yet they're criticized for doing that which they are sworn to do. How many people would have run after a man . . . .

9 A-1398-19

Defense counsel interposed an objection to the rhetorical question posed by the State. The court sustained the objection. The State shifted the focus of its summation to Cabezas' credibility, stating:

> [b]ecause frankly, ladies and gentlemen, let's be blunt, if you don't believe them why would you believe a fingerprint expert who would come in here and say, oh yeah[,] we found fingerprints on the gun. Or why don't you believe the DNA expert who came in and said oh we found DNA on the gun, it's the defendant's.

Near the end of his summation, the State quoted a "famous prosecutor" from the Nuremburg Trials.[3]

> "The suspended judgement with which we opened this case is no longer appropriate. The time has come for final judgment. And if the case I present seems harsh and uncompromising, it's because the evidence makes it so. If you were to say of these men that they are not guilty, it would be as true to say there has been no crime."

After the summations concluded, the judge provided the jury with their final jury charges, including instructions that the comments and remarks of counsel are not evidence.

---

[3] The Nuremberg trials were a series of thirteen trials carried out in Nuremberg, Germany, between 1945 and 1949. The defendants, who included Nazi Party officials and high-ranking military officers along with German industrialists, lawyers and doctors, were indicted on such charges as crimes against peace and crimes against humanity. Nuremberg Trials, HISTORY, https://www.history.com/topics/world-war-ii/nuremberg-trials (June 7, 2019).

A-1398-19

On appeal, defendant argues that the State's comments during summation were improper because they: (1) bolstered the officers credibility based solely on their status as police officers, (2) pitted defendant against the police, (3) misled the jury with issues outside the evidence presented, (4) made inaccurate factual assertions, (5) attacked defendant and defense counsel, (6) expressed the prosecutor's own opinion as to guilt, and (7) needlessly injected the Nuremberg Trials to incite the jury, to make defendant appear dangerous, and to improperly increase the odds of conviction. The State argues instead that its comments at summation were in response to defense counsel's closing argument.

We recognize that there was a single objection to the State's closing remarks, and hence we evaluate the remarks by the plain-error standard, namely whether the misconduct was so egregious in the context of the summation as a whole as to deprive defendant of a fair trial. See, e.g., State v. Smith, 167 N.J. 158, 181-82 (2001); State v. Frost, 158 N.J. 76, 83, 87-89 (1999). See also, State v. Josephs, 174 N.J. 44, 124 (2002) ("Generally, if counsel did not object, the remarks will not be deemed prejudicial.").

Prosecutors are accorded considerable latitude in summing up the State's case forcefully and graphically. State v. Tilghman, 345 N.J. Super. 571, 575 (App. Div. 2001). Nevertheless, prosecutors also have an "overriding obligation

to see that justice is fairly done." Ibid. Thus, while prosecutors "may strike hard bows, [they] [are] not at liberty to strike foul ones." Ibid. (quoting Bergen v. United States, 295 U.S. 78, 88 (1935) ("It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.")). A prosecutor's comments must remain fair and tethered to the evidence presented. Frost, 158 N.J. at 83.

Based on this record, we are persuaded that two of the State's comments, the DNA/fingerprint comment as well as the Nuremburg Trials quote, were "foul blows" which "exceeded the parameters of permissibly forceful advocacy." See State v. Munoz, 340 N.J. Super. 204, 217 (App. Div. 2001).

The State's DNA/fingerprint remark improperly equated the reliability of lay witness testimony to scientific, forensic evidence. It also conveyed the inaccurate impression that fingerprint and DNA evidence were recovered in this case, and that the DNA belonged to defendant. This assertion had no basis in the record, and it was patently untrue. See State v. Rodriguez, 365 N.J. Super. 38, 48 (App. Div. 2003) ("Prosecutor's may not make inaccurate factual or legal assertions during summation . . . ."). By making inaccurate factual assertions and misleading comparisons in an attempt to bolster the officers' credibility, the

DNA/fingerprint comment was "clearly capable of producing an unjust result. "

In a case where defendant's guilt or innocence hinged on whether the jury believed the officers' testimony, we cannot conclude that this misconduct was harmless. See R. 2:10-2; State v. Maloney, 216 N.J. 91, 104 (2013).

The State's Nuremberg Trials remark at closing is equally concerning. "Prosecutors must walk a fine line when making comparisons, whether implicit or explicit, between a defendant and [those] whom the jury associates with violence or guilt." State v. Williams, 244 N.J. 592, 617 (2021) (finding the comparison of defendant to Jack Nicholson's character in "The Shining" was "clearly capable of having an unfair impact on the jury's deliberations . . . and constituted reversible error"). The State's comment, "[if] you were to say of these men that they are not guilty, it would be as true to say there has been no crime," mischaracterizes the burden of proof for the jury. During its charge to the jury, the court gave the standard model jury charge on reasonable doubt, stating in pertinent part:

> The State has the burden of proving the defendant guilty beyond a reasonable doubt. Now some of you may have served in civil cases where you were told that it's only necessary to prove that a fact is more likely true than not true. In criminal cases the State's proof must be more powerful than that. It must be beyond a reasonable doubt.

A-1398-19

A reasonable doubt is an honest and reasonable uncertainty in your mind about the guilt of the defendant after you have given full and impartial consideration to all of the evidence. A reasonable doubt may arise from the evidence itself or from a lack of evidence. It is a doubt that a reasonable person hearing the same evidence would have. Now proof beyond a reasonable doubt, for example is proof that leaves you firmly convinced of the defendant's guilt. In this world, we know very few things with absolute certainty. In criminal cases, the law does not require proof that overcomes every possible doubt. If based on your consideration of the evidence you are firmly convinced that the defendant is guilty of the crime charged, you must find them guilty. If on the other hand you are not firmly convinced of the defendant's guilt you must give the defendant the benefit of the doubt and find him not guilty.

The State essentially placed the jurors in the position of choosing between competing burdens of proof, telling the jurors that if they rendered a not guilty verdict, then there was "no crime." The comment also had the wrongful effect of suggesting to the jury that if they thought a crime took place, then defendant must be culpable. Even the court's reasonable doubt charge could not neutralize this improper characterization of the State's burden of proof and its potential to mislead jurors during deliberations on a fundamental principle of criminal jurisprudence. The Nuremburg quote was "clearly capable of having an unfair impact on the jury's deliberations." Williams, 244 N.J. at 616.

14

When viewed together, the State's DNA/fingerprinting and Nuremburg comments during summation are intrusions upon defendant's right to a fair trial and constitute reversible error, warranting a new trial.

IV.

Prior Inconsistent Statements of Officer Cabezas and
Juror Number Seven

A.

Officer Cabezas

Cabezas testified on the first day of trial. He stated on direct, that defendant "immediately began to pull on the handles of the door while . . . one hand was pulling, the other one was just holding his waistband area." He further stated that "[h]is other hand was in his waistband area as he[] [was] pulling the handle of the parked car." Cabezas also testified that, during the chase, defendant "kept looking back with the gun in his right hand and actually almost pointed the gun at me, which is [why] I was very close to maybe discharging my weapon . . . for my safety . . . . I remember that clearly."

Trial counsel cross-examined Cabezas, focusing primarily on inconsistencies between his trial testimony, his police report, and his suppression hearing testimony. Counsel emphasized that Cabezas never

15

mentioned until trial that he: (1) observed defendant holding his waistband, or (2) saw defendant pointing the gun at him.

In order to refresh his recollection, counsel presented Cabezas with his written incident report as well as the motion to suppress hearing transcript from 2017.[4] Cabezas identified the incident report and confirmed he was the author. When asked to point out where in the report he stated that he saw defendant holding his waistband, Cabezas replied "I didn't write that in the report."

> Q: You didn't write it in your report. Did you also mention anywhere in your report that he pointed the gun at you twice?
>
> A: No, I didn't put that in the report.

---

[4] When questioned about the incident at the suppression hearing, Cabezas did not specifically say he saw defendant holding his waistband area while pulling on the door handles. On direct he testified: "[a]s he's pulling on the handles we get out of the car, we begin to approach him, and then that's when he . . . pulled the handgun out of his waistband area." On cross, Cabezas stated that defendant pulled the gun out from "[t]he front of his waistband" and that this "was the first time [he] noticed the gun." Trial counsel questioned how Cabezas "didn't see the handle of a .357 magnum in [defendant's] waistband from ten feet away until he pulled it up" but Cabezas maintained that the first time he saw the gun was when he "reached in his waistband and pulled the gun out . . ." and that he didn't remember if defendant had to lift his shirt to do so.

A-1398-19

Next, Cabezas was questioned about the transcript from the suppression hearing. Counsel again asked Cabezas to point out where he mentioned defendant holding his waistband.

> Q: Can you show me where in your testimony either in direct or cross where you mentioned he was holding his waistband? You can look at the whole transcript if you want. . . .
>
> A: I don't know.
>
>     . . . .
>
> Q: It was loose sweatpants; right?
>
> A: Correct.
>
> Q: But you didn't mention him holding anything; right?
>
> A: No, I just said his hand was in his waistband like --
>
> Q: Where does it say that? Go ahead, find that.
>
> A: No, it's not -- it's not here.
>
> Q: It's not there. You didn't testify to that one year after the incident; right?
>
> A: Correct.
>
> Q: And you didn't write it down the day of the incident; right?
>
> A: Correct.

A-1398-19

Q: This is the first time in three years you've ever mentioned that; isn't it?

A: Correct.

Q: Okay, is it also the first time in three years that you ever mentioned he pointed the gun at you?

A: This is the first time I was asked, yes . . . .

Trial counsel later made an application, based on State v. Provet, 133 N.J. Super. 432 (App. Div. 1975), seeking a jury charge on prior inconsistent statements. Specifically, counsel requested a charge on using prior inconsistent statements for credibility purposes as well as for substantive evidence. Counsel argued that according to Provet, the two omissions by Cabezas, "serve as an applied contradiction of the statement by the witness," permitting the jury to consider the omissions for purposes of impeaching Cabezas, and as substantive proof that his trial testimony was untrue.

The court declined to give the Provet charge. It found the facts in Provet distinguishable because in Provet the prior inconsistent statement was an affirmative statement, not an omission, and the underlying documents containing the statements were admitted as evidence, not purely used to refresh recollection.

18

Defendant contends the trial court committed reversible error by failing to inform the jury that the witness's earlier omissions could be considered both for credibility purposes and as "substantive evidence or proof of the truth of the prior contradictory statement or omitted statement." Model Jury Charges (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (approved May 23, 1994). We agree.

The Model Charge with respect to prior contradictory statements of witnesses makes several references to using inconsistent statements as substantive evidence. For example, it states that "[the inconsistent statement] may also be considered by you as substantive evidence, that is, as proof of the truth of what is stated in the prior contradictory statement" and "[t]his evidence may be considered by you as substantive evidence or proof of the truth of the prior contradictory statement or omitted statement." Ibid.

Generally, this charge must be given if the statements or omissions, go "directly to the issue" of the underlying offense, create an "alternative version of the crime scenario," or present a "conflicting version of the same event . . . ." See State v. Allen, 308 N.J. Super. 421, 427-29 (App. Div. 1998); State v. Hammond, 338 N.J. Super. 330, 343-42 (App. Div. 2001). The inconsistency must be more than a blanket denial of any knowledge of this incident, and

19

actually possess substantive exculpatory value of its own.  Hammond, 338 N.J. Super. at 343-42.  Otherwise, an instruction on considering the inconsistent statement or omission for its substance would not be "needed to protect defendant's rights."  Ibid.

The officer's conflicting testimony was more than a blanket denial or disavowal of the events that transpired.  He testified to specific events which he omitted from his pre-trial report as well as his pre-trial testimony.  These details went to the essence of defendant's main defense: that he never possessed a gun. Viewed through the lens of this record, these omissions have "significant substantive exculpatory value."  Id. at 343.  We find that the trial court erred when it declined to give the prior inconsistent statement jury charge.

B.

Juror Number Seven

Defendant also urges us to reverse his conviction because the trial court failed to voir dire the remaining jurors to ascertain whether they had been tainted by any information Juror Seven may have imparted to them.

After the first day of trial, Juror Seven came forward and spoke with the court and counsel for both parties at sidebar.  Juror Seven explained that while he didn't recognize Officer Cabezas' last name from the witness list at the initial

20

voir dire, he remembered him after he saw Cabezas' face and heard his first name, Onofre. The juror described his relationship with Cabezas as "friendly" and that he knew him through family members on the police force. Juror Seven also revealed that he coached soccer every day approximately a block away from where the incident took place.

The record shows that the court found that Juror Seven "was very candid" and "being very honest." Counsel and the court agreed that the juror properly came forward, and neither counsel objected to excusing the juror. The record shows that neither the State nor the defense requested additional voir dire. The court thanked and dismissed the juror, citing "familiarity with one of the witnesses." Before Juror Seven departed, the State asked if, during the only ten-minute break of the day, the juror had mentioned his knowledge of the area or of Officer Cabezas to other jurors. Juror Seven stated, "No, I kept it to myself." The next day the court informed the jury that Juror Seven was excused for personal issues, and they were directed not to speculate as to why Juror Seven had been excused.

Should it become apparent during the course of a trial "that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's

 A-1398-19

impartiality." State v. R.D., 169 N.J. 551, 557-58 (2001) (citing State v. Bey, 112 N.J. 45, 83-84 (1988)). At minimum, the court is obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the "inquiry must expand to determine whether any other jurors have been tainted thereby." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:16-1 (2022); see also State v. Bisaccia, 319 N.J. Super. 1, 13 (App. Div. 1999) (stating that if actual juror taint is possible, court must voir dire affected juror and, in appropriate circumstances, the remaining jurors).

The court should "inquire into . . . whether the juror intentionally or inadvertently . . . imparted any of [the extraneous] information to other jurors." R.D., 169 N.J. at 560. And, "[d]epending on the juror's answers . . . the court must then determine whether it is necessary to voir dire individually other jurors to ensure the impartiality of the jury." Ibid. This assessment requires the court to examine "whether there was at least an opportunity for the extraneous information to reach the remaining jurors when that extraneous information is knowledge unique to one juror who is excused mid-trial." Id. at 559 (citing State v. Wormley, 305 N.J. Super. 57, 70 (App. Div. 1997) (finding that even though excused juror stated she did not discuss extraneous matter with anyone, there was a "strong likelihood that, even indirectly or unintentionally, she may well

22

have," given that there was at least one break during which jurors commingled informally)).

There is no per se rule requiring the court to individually voir dire the other members of the jury when handling mid-trial juror taint, id. at 561; however, failing to do so when these circumstances arise may be grounds for reversal. See Bisaccia, 319 N.J. Super. at 16-19. It is a decision that "remains a matter for the sound discretion of trial court[,]" but one that "should be explained on the record to facilitate appellate review under the abuse of discretion standard." R.D., 169 N.J. at 560 (emphasis added).

Here, Juror Seven had at least one opportunity to convey his knowledge of the area and his "friendly" relationship with Cabezas to the rest of the jury. After recognizing Cabezas, there was a ten-minute break between the testimony of Mendes and Brown where the jury was allowed to commingle outside the presence of the trial court. This break represented an opportunity for the jury to be exposed to Juror Seven's extraneous information. Id. at 559. The trial court's assessment of Juror Seven's veracity and his disclaimer as to having conveyed his knowledge are important considerations, but the response of a juror is not necessarily sufficient. Id. at 563.

Without the court's targeted questioning of the remaining jurors, we cannot be assured that Juror Seven did not convey, either directly or indirectly, his outside knowledge. "Securing and preserving an impartial jury goes to the very essence of a fair trial." Bey, 112 N.J. at 74. Thus, we conclude the trial court abused its discretion and that additional voir dire was necessary here to safeguard defendant's constitutional right to a "trial by an impartial jury." R.D., 169 N.J. at 557 (citing U.S. Const. amends. VI, XVI and N.J. Const. art. I, ¶ 10).

V.

Cumulative Impact

For sake of completeness, we briefly address defendant's additional argument that the cumulative impact of the trial court's errors warrants a new trial. Cumulative error occurs when errors that would not require reversal by themselves, together "cast doubt on [the] verdict and call for a new trial." State v. Sanchez-Medina, 231 N.J. 452, 469 (2018). See also Jenewicz, 193 N.J. at 473.

While we have found those errors independently warrant a new trial, considered cumulatively, they certainly "undermined defendant's right to a fair trial" and "raise serious questions about whether the outcome was just, particularly in light of the strength of the evidence presented." Ibid. (finding

lack of jury instructions on how to assess identification of defendant and provocative evidence about defendant's immigration status undermined defendant's right to a fair trial where the State's evidence against defendant was not overwhelming); see also State v. Sui Kam Tung, 460 N.J. Super. 75, 103-04 (App. Div. 2019) (concluding prosecutor's out of bounds statements during closing combined with other errors, including an inadequate jury charge, deprived defendant of a fair trial)

## VI.

### Vacation of Guilty Plea as to Indictment II

Finally, defendant makes a brief argument that his guilty plea should be vacated. Defendant relies on State v. Hager, 462 N.J. Super. 377 (App. Div. 2020). There, the defendant pled guilty to a gun charge after being convicted of resisting arrest. Id. at 380-81. We subsequently reversed the conviction based on an evidentiary error and vacated defendant's guilty plea because the conviction "led directly" to his plea. Id. at 388-89 (vacating defendant's guilty plea after finding the judge's incorrect evidentiary ruling led directly to defendant's guilty plea). Accordingly, defendant argues his plea should be vacated because his conviction in Indictment I "led directly" to his guilty plea on Indictment II. We disagree.

25

Unlike Hager, here defendant's plea was for an entirely separate incident under an entirely separate indictment. To be sure, in Hager, the defendant was charged in a three-count indictment with third-degree terroristic threats, fourth-degree resisting arrest, and second-degree certain persons possessing a weapon, all stemming from an altercation at defendant's home. Hager, 462 N.J. Super. at 381. After being convicted on a lesser included disorderly persons offense of resisting arrest, but prior to the trial on the certain persons charge, Hager negotiated a plea deal to an amended charge of third-degree unlawful possession. Ibid.

The Hager case is distinguishable from the case a bar for two key reasons. First, this was not a bifurcated trial where the charges originated from the same incident. Here, there was a separate event years later that gave rise to the charges in Indictment II. Second, Hager's resisting arrest conviction was reversed because we found his custodial statement about the location of his BB gun was obtained before he could be fully informed of his Miranda rights. Deeming the BB gun statement inadmissible impacted defendant's likelihood of success on the certain persons/unlawful possession charge, so vacating that plea was justified. Here, the alleged errors in defendant's Indictment I trial have no

26

bearing on his likelihood of success on Indictment II: an amended third-degree conspiracy charge and third degree-possession of a CDS with intent to distribute.

We do not find, based on this record, that defendant's Indictment II guilty plea should be vacated in light of our reversal of his Indictment I conviction.

Because we are remanding for a new trial, we do not address defendant's contentions about his sentence.

Affirmed in part; vacated and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1398-19