768 A.2d 1069 (2001)
338 N.J. Super. 330
STATE of New Jersey, Plaintiff-Respondent,
v.
Earl M. HAMMOND, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 27, 2001.
Decided March 26, 2001.
*1070 Susan Brody, Assistant Deputy Public Defender, argued the cause for appellant (Peter A. Garcia, Acting Public Defender, attorney; Ms. Brody, of counsel and on the brief).
Simon L. Rosenbach, Assistant Prosecutor, argued the cause for respondent (Glenn Berman, Middlesex County Prosecutor, attorney; Mr. Rosenbach, of counsel; Jean Blalock, Legal Assistant, on the brief).
Before Judges PRESSLER, KESTIN and ALLEY.
The opinion of the court was delivered by ALLEY, J.A.D.
Defendant was indicted and tried to a jury on charges of purposeful or knowing murder, N.J.S.A.2C:11-3a (1) and (2) (Count One); two charges of possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a (Counts Two and Eight); armed robbery, N.J.S.A. 2C:15-1 (Count Three); two charges of aggravated assault, N.J.S.A. 2C:12-1b(4)(Counts Four and Five); and two charges of terroristic threats, N.J.S.A. 2C:12-3a (Counts Six and Seven). He was convicted on all but the terroristic threats charges, which the trial court dismissed.
The court imposed the following sentences on these convictions: 30 years with a period of 30 years without parole for murder (Count One); 15 years with a period of 5 years without parole for armed robbery (Count Three), consecutive to the murder sentence; and 18 months with a period of 18 months without parole for the aggravated assault conviction under Count Five, concurrent to the murder conviction. The court merged the aggravated assault conviction under Count Four and the possession of a weapon for an unlawful purpose conviction under Count Eight into the murder conviction (Count One). The result was an aggregate sentence of 45 years imprisonment, with 35 years to be served without parole.
Defendant allegedly committed an armed robbery of Glen (Goon Goon) Edward, John (Dash) Robinson, and Robert (Bashie) Etienne in July 1995. Three days after the robbery, the victims together with others allegedly attacked defendant in retaliation for the robbery. Badly beaten in the attack, defendant was hospitalized for about six weeks. The State's theory *1071 was that after defendant's release from the hospital, he killed "Frankie" Paul Robinson in retaliation for the assault by shooting him numerous times, late at night or in the early morning of September 14-15, although Robinson apparently had no involvement in the assault. The trial and convictions involved the charges arising out of the July robbery and the September homicide.
Defendant appeals from his convictions and sentence, contending as follows:
I. THE PROSECUTOR'S REMARKS DESIGNED TO ELICIT SYMPATHY FOR THE VICTIM FAR EXCEEDED THE SCOPE OF FAIR COMMENT, THUS DEPRIVING DEFENDANT OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.
II. BECAUSE THE COURT IMPROPERLY REFUSED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSES OF AGGRAVATED AND RECKLESS MANSLAUGHTER, DEFENDANT'S MURDER CONVICTION MUST BE REVERSED.
III. THE COURT'S FAILURE TO INSTRUCT THE JURY ON HOW TO EVALUATE PRIOR INCONSISTENT STATEMENTS MADE BY THE STATE'S WITNESSES DEPRIVED DEFENDANT OF A FAIR TRIAL.
IV. THE COURT ERRED IN IMPOSING THE PRESUMPTIVE SENTENCE FOR THE OFFENSE OF ARMED ROBBERY.

I
The evidence included the following: The victim's body was discovered on September 15, 1995, on Reservoir Avenue in New Brunswick at approximately 6:15 a.m. Several nine millimeter shell casings lay near the body. The medical examiner arrived on the scene at 7:45 a.m. and estimated that the victim had been dead for five hours, putting his time of death at about 2:30 a.m. An autopsy showed that the victim had been shot five times at close range. The medical examiner testified that the victim died of multiple gunshot wounds to his shoulder, neck, back, leg and chest, and concluded that the death was homicidal.
A police investigation initially produced little if any information from neighborhood residents, most of whom initially denied possessing any knowledge of the homicide. A deliberate increase in police presence on Reservoir Avenue, a high-drug area, was put into effect to promote cooperation with the stalled murder investigation and to step up the war on drugs. Several fruitful interviews and re-interviews with various neighborhood residents followed. Some of these residents recanted their initial statements and supplied relevant information or implicated defendant in the murder of the victim. Defendant fled to his native Detroit after the killing.
As stated, defendant had been seriously injured when, on July 30, 1995, in revenge for the robbery he had committed a few days earlier, victims of the robbery and their friends assaulted him. On several occasions after he was released from the hospital, defendant vowed to several individuals that he intended to seek revenge against his attackers. Glenn (Goon Goon) Edward testified, for example, that whenever he saw defendant on the street defendant would make a gesture with his hand pretending to be shooting at Edward. Tammy Voorhees, defendant's girlfriend, also testified that defendant told her that he intended to get even with John Robinson.
On September 14, 1995, defendant attempted to make good on his threats to even the score with his assailants but, according to the State, the object of his revenge was the apparently innocent "Frankie" Paul Robinson, a third party who reportedly had not even been present *1072 during the assault on defendant. The victim was not related to John (Dash) Robinson. On the night of the homicide, several people were socializing outside on the steps of 50 Reservoir Avenue in an area described as a "bad neighborhood." Among those present were Kaseem, whose last name is unknown, Skylyn (Skills) Hagins, Jermaine Ingram, and defendant. Hagins testified that at some point that night the victim came up to 50 Reservoir on his bicycle and twice asked if anyone had seen John (Dash) Robinson. Defendant, sounding noticeably upset, responded, "You asking for who[?]" The victim repeated himself a third time, and defendant then responded, "I know where he at, let me ... take you to him." The victim slowly proceeded to follow behind defendant keeping a "bit" of space between himself and the defendant. Hagins testified that as the victim and defendant were receding into the dark he noticed that defendant was carrying something in his waist but could not discern whether it was a weapon. Moments later, the victim and the defendant disappeared into an alleyway away from Hagins' view for approximately 3 to 5 minutes.
Hagins proceeded down the street from 50 Reservoir, and when he got close he saw defendant beating the victim even as the victim pleaded with defendant to stop his assault. Defendant continued his attack until the victim fell to the ground. At that point Hagins testified that the victim
was lying down ... still pleading [with defendant and] then [defendant] brought out the gun and then he popped him and then I see a spark and I see the gunshot go off, then he popped him again.
Once Hagins heard the second shot ring out, he turned around and retreated via Reservoir Avenue toward his apartment. The shots continued to ring out in rapid succession as Hagins was fleeing and in his estimate defendant fired more than ten shots. The first two shots Hagins saw were fired from close range, that is, the victim was approximately two feet away from the barrel of the gun. Hagins initially had told the police that he had not been "out there" on the night of the shooting and knew nothing of the incident. At trial, however, Hagins recanted this initial statement to officers and testified that he in fact witnessed the defendant fire at least two shots into the victim.
Gregory Ingram, a neighborhood building superintendent, also testified as an eyewitness to Robinson's killing. He testified that he was outside 50 Reservoir Avenue when the victim rode up on his bike. He heard the victim ask for John (Dash) Robinson and Glen (Goon Goon) Edward just when defendant emerged from inside 50 Reservoir where he resided. Ingram heard defendant offer to take the victim to them. He saw defendant lead the victim around the side of 37 Reservoir Avenue, saw them scuffling and saw defendant shoot the victim at least twice from about six to eight feet away. After the second shot was fired Ingram testified that he left the area. The shooting continued. Ingram was not sure, however, how may shots were discharged altogether but thought that defendant had fired more than five bullets. When first asked about the incident a few days later, Ingram reportedly informed police that he was at home in bed on the night in question. At trial, however, Ingram recanted this initial statement to officers and acknowledged that he in fact had seen defendant discharge at least two bullets into the victim.
Jermaine Ingram, Gregory's brother, was also on Reservoir Avenue the night the victim was murdered. He testified that he was across the street in front of 53 Reservoir "chilling" with his girlfriend, when he observed the victim ride up Reservoir Avenue on his bicycle. He saw the victim approach the group of people standing in front of 50 Reservoir, defendant among them, and ask for John (Dash) Robinson and Glen (Goon Goon) Edward. Defendant proceeded to escort the victim around the corner, and a few minutes later Ingram heard but did not see gunshots *1073 being fired. The next thing Ingram saw was Hagins running up Reservoir announcing loudly that someone was shooting. Ingram did not know exactly how many shots were fired but testified that it was more than three and probably could have exceeded fifteen but that he could not be sure exactly the number of shots discharged. He admitted that his memory was faulty because at the time he had been living in a marijuana-induced haze. When first questioned by police about the incident, Ingram also denied seeing or hearing anything because he was afraid. He later recanted.
Defendant's girlfriend, Tammy Voorhees, testified that defendant came into their motel room at around 2:00 a.m. and informed her that they were leaving for Detroit, a trip they had been planning for some time but never finalized. A man unknown to Voorhees drove them from the Motel 6 where they were staying to a second motel in Edison. Voorhees testified that she signed the motel registry under her sister's name but could not explain using an assumed name. After a couple of hours spent at the second motel the same man drove them to a bus station in East Brunswick where they took a bus to New York. From New York they boarded another bus to Detroit where they stayed with defendant's mother.
Voorhees spoke to her sister in New Jersey over the telephone and learned for the first time that the victim had been killed. She then asked defendant about the incident, and he explained that the victim had been looking for John (Dash) Robinson, that Kareem Middleton had shot him, and that defendant had then "finished him off."

II
We first address defendant's contention that his first-degree murder conviction should be reversed because the trial judge, despite defense counsel's request, did not deliver an aggravated or reckless manslaughter instruction to the jury. N.J.S.A. 2C:11-4a and b. Defendant contends that the presence of evidence in the record from which a jury reasonably could have concluded that the defendant was guilty of a reckless, rather than a purposeful or knowing act of homicide warranted such a charge. On this basis, defendant urges that we reverse his murder conviction.
We are satisfied that the record did not support charging the lesser included offenses of aggravated or reckless manslaughter. N.J.S.A. 2C:1-8(e) provides that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."
Our Supreme Court pointed out in State v. Powell, 84 N.J. 305, 314, 419 A.2d 406 (1980), that in determining whether a manslaughter charge should have been given, courts must look at the inferences that can be properly drawn from the proofs contained in the record. "[T]here are no legal rules as to what inferences may be drawn. The question is one of logic and common sense." Id.
In this case, defendant argues that because he allegedly fired approximately thirteen shots and only five of them, according to the medical examiner, hit the decedent, the jury could have conceivably concluded that defendant acted recklessly rather than intentionally. On this basis, the defendant requested a charge of aggravated or reckless manslaughter. When pressed to take a position, the State objected to such a charge. The trial court concluded that there was no "rational basis for anybody to believe that in fact the defendant was just shooting his gun around and accidentally happened to shoot the victim five times, one being at close range." The court declined to charge either aggravated or reckless manslaughter.
We are satisfied that the record lacks credible evidence to support either manslaughter charge. In fact, the evidence *1074 suggests only that defendant acted intentionally and knowingly rather than with mere recklessness. Nor for that matter does the record support a finding that defendant acted under circumstances manifesting extreme indifference to human life. The evidence, including eyewitness accounts of the event, rationally supports no finding other than that defendant acted deliberately and intentionally in causing the victim's death.
Skylyn Hagins and Gregory Ingram both testified, for example, that they witnessed the murder, which testimony was credited by the jury. Each stated that they observed defendant lure the victim into a vacant alley, that defendant struck the victim several times before he fell off his bicycle and collapsed to the ground, that defendant continued his assault on the victim even while he lay on the ground, and that although the victim pleaded with defendant to stop hitting him his pleas were ignored.
Instead of breaking off his attack, defendant proceeded to draw a weapon, stood over the victim with the barrel of the gun pointed directly at him, and discharged two shots in succession at close range directly at the victim. Witnesses, including Hagins and Ingram, heard the first two shots and the numerous shots that followed.
We conclude that the nature of defendant's conduct is similar to that of other cases in which our Supreme Court has found no rational basis to conclude that the defendant might have only intended to inflict serious bodily injury. See, e.g., State v. Harris, 141 N.J. 525, 550-51, 662 A.2d 333 (1995) (finding no rational basis when defendant fired single shot into victim's back and neck at close range while victim was laying on ground. "But what purpose did the gunshot have other than to kill?"); State v. Biegenwald, 126 N.J. 1, 18, 594 A.2d 172 (1991) (finding no rational basis when defendant shot victim four times in head at close range); State v. Hightower, 120 N.J. 378, 413, 577 A.2d 99 (1990) (finding no rational basis when defendant shot victim three times, including one shot to brain, at close range); State v. Rose, 120 N.J. 61, 64, 576 A.2d 235 (1990)(finding no rational basis when defendant fired sawed-off shotgun into victim's abdomen at point-blank range). As in these cases, defendant's close-range killing of "Frankie" Paul Robinson, with several bullets entering his shoulder, neck, back, leg and chest, leaves no rational basis for a jury to have found anything but an intentional murder. Therefore, defendant's contention that aggravated or reckless manslaughter should have been charged as a lesser-included offense is without merit.

III
We next address defendant's contention that the trial court erred by failing, despite defense counsel's objection, to instruct the jury specifically on how they should evaluate prior inconsistent statements made by the State's two key eyewitnesses, namely, Gregory Ingram and Skylyn Hagins. The Model Charge approved on May 23, 1994, with respect to prior contradictory statements of witnesses who are not the defendant reads:
Evidence, including a witness' statement or testimony prior to the trial, showing that at a prior time a witness has said something which is inconsistent with the witness' testimony at the trial may be considered by you for the purpose of judging the witness' credibility. It may also be considered by you as substantive evidence, that is, as proof of the truth of what is stated in the prior contradictory statement.
Evidence has been presented showing that at a prior time a witness has said something or has failed to say something which is inconsistent with the witness' testimony at the trial. This evidence may be considered by you as substantive evidence or proof of the truth of the prior contradictory statement or omitted statement.

*1075 However, before deciding whether the prior inconsistent or omitted statement reflects the truth, in all fairness you will want to consider all of the circumstances under which the statement or failure to disclose occurred. You may consider the extent of the inconsistency or omission and the importance or lack of importance of the inconsistency or omission on the overall testimony of the witness as bearing on his or her credibility. You may consider such factors as where and when the prior statement or omission occurred and the reasons, if any, therefor.

[CHARGE IF APPLICABLE]
In regard to the testimony of (witness' names) on cross-examination inconsistencies were shown (admitted) between the prior statements and those given on the stand [or: between the witness's prior silence and statements on the stand.] The witness(es) gave reasons therefor, saying that [many of] such prior statements or omissions were untrue. Among the reasons given that I recall, were (list reasons: self protection, exculpation, poor recollection at the time, things recently remembered and not, therefore, formerly disclosed, not believing a matter was important, etc.)
The extent to which such inconsistencies or omissions reflect the truth is for you to determine. Consider their materiality and relationship to (his/her) entire testimony and all the evidence in the case, when, where and the circumstances under which they were said or omitted and whether the reasons (he/ she) gave you therefor appear to be to you believable and logical. In short, consider all that I have told you before about prior inconsistent statements or omissions.
You will, of course, consider other evidence and inferences from other evidence including statements of other witnesses or acts of the witness and others, disclosing other motives that the witness may have had to testify as (he/she) did, that is, reasons other than which (he/ she) gave to us.
Perhaps, a hypothetical example will help you to understand what constitutes a prior contradictory statement and, more importantly, how it may be used by you. Assume at the trial the witness testifies: "The car was red". In cross-examination of that witness, or at some other point in the trial, it is shown that at an earlier time, the witness testified or said: "The car was blue". You may consider the prior contradictory statement that "The car was blue" as a factor in deciding whether or not you believe that statement made at trial that "The car was red". You may also consider the earlier statement that "The car was blue" as proof of the fact or a evidence that the car was blue.
A brief review of the relevant facts shows that in the days following the murder, Gregory Ingram and Skylyn Hagins, the State's two principal identification witnesses, informed investigating officers that they knew nothing about the homicide. Ingram reportedly informed police that he was at home in bed on the night in question. Hagins initially told police that he had not been "out there" on the night of the shooting and knew nothing of the incident. At defendant's trial, however, both witnesses recanted these initial statements to officers and testified that they in fact had witnessed the defendant fire at least two shots into the victim.
The trial court provided the jury with standard instructions regarding witness credibility. Our focus is on whether the charge as a whole was adequate to enable the jury to properly evaluate and make determinations respecting the prior inconsistent statements of the State's two key eyewitnesses. Defendant contends that the trial court should have specifically given a prior inconsistent statement charge, that is, the trial court should have instructed the jury that it could use the prior inconsistent statements to assess the witnesses' *1076 credibility and as substantive evidence. The trial judge's failure to do so, asserts defendant, significantly impeded the jury's ability to weigh witness credibility and denied him a fair trial.
Having carefully scrutinized the issue as to whether, on this record, the absence of a jury instruction concerning the use of an inconsistent statement as substantive evidence had a prejudicial effect, we conclude that with the judge's instructions on credibility, the vigorous arguments of defense counsel on credibility, and the common sense of the jury, the members of the jury were well and amply equipped to deal with such inconsistencies.
In State v. Allen, 308 N.J.Super. 421, 706 A.2d 220 (App.Div.1998), we addressed the trial court's failure to instruct the jury regarding prior inconsistent statements. While recognizing that instructions to a jury are to be examined as a whole, State v. Gartland, 149 N.J. 456, 473, 694 A.2d 564 (1997); State v. Delibero, 149 N.J. 90, 106-07, 692 A.2d 981 (1997), State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973)("[P]ortions of a jury charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect."), we nevertheless concluded that the abbreviated credibility charge and the absence of both inconsistent statement and deliberation charges amounted to cumulative error warranting reversal of the defendant's conviction. Allen, 308 N.J.Super., at 431, 706 A.2d 220.
There is a marked contrast between the inconsistencies in the Hagins and Ingram statements, on one hand, and the typical cases contemplated by the Model Charge on inconsistent statements. In the example in the Model Charge, the inconsistency in the witness's statements is that on one occasion the witness states that a car was red and on another occasion that it was blue. These two statements are not merely inconsistent. In addition to the inconsistency, the essence of each may, if the jury chooses, be used as substantive evidence concerning the disputed factual issue. Here, however, there was only an inconsistency, not one or more conflicting versions of the same event. We conclude that it was not error to omit from the instructions to this jury on the particular facts here presented the essence of the portion of the Model Charge with which we are here concerned as shown by the following excerpts from the Model Charge:
Evidence, including a witness' statement or testimony prior to the trial, showing that at a prior time a witness has said something which is inconsistent with the witness' testimony at the trial may be considered by you for the purpose of judging the witness' credibility. It may also be considered by you as substantive evidence, that is, as proof of the truth of what is stated in the prior contradictory statement.

Evidence has been presented showing that at a prior time a witness has said something or has failed to say something which is inconsistent with the witness' testimony at the trial. This evidence may be considered by you as substantive evidence or proof of the truth of the prior contradictory statement or omitted statement ....

* * *
Perhaps, a hypothetical example will help you to understand what constitutes a prior contradictory statement and, more importantly, how it may be used by you. Assume at the trial the witness testifies: "The car was red." In cross-examination of that witness, or at some other point in the trial, it is shown that at an earlier time, the witness testified or said: "The car was blue." You may consider the prior contradictory statement that "The car was blue" as a factor in deciding whether or not you believe that statement made at trial that "The car was red." You may also consider the earlier statement that "The car was blue" as proof of the fact or a evidence that the car was blue.

*1077 [Emphasis added.]
If, by contrast, either or both of the alleged eyewitnesses, Hagins and Ingram, had initially stated that they had witnessed the crime and that it was committed by someone other than defendant or that defendant was present but acted only in self-defense, such testimony self-evidently would have been valuable substantive evidence, from which the defendant could have urged to the jury that the State had not proved its contentions as to defendant's guilt beyond a reasonable doubt. Here, however, the inconsistency proffered was a mere blanket denial of any knowledge of the crime, rather than an alternative version of the crime scenario. We note that our observations in this case must be taken in the context of its special facts, and also that this is not, as Allen was, a cumulative error case, and that the trial court gave a full and appropriate general credibility charge.
To summarize, the out-of-court prior inconsistent statements that are before us here lack any significant substantive exculpatory value that is pertinent to the jury instructions whose omission defendant challenges. The inconsistency arises from the witnesses' total disavowal to the authorities of any knowledge of an incident, in contrast to their testimony at trial in which they recounted the incident in detail. In these particular circumstances, because the import of the out-of-court prior inconsistent statements went solely to the issue of credibility and they had no substantive exculpatory value of their own that is relevant to the jury instruction on prior inconsistent statements of witnesses, such an instruction was not needed to protect defendant's rights. On the contrary, we are satisfied that the jury, as instructed on credibility by the court, and as informed by its common sense and relevant life experience, was fully qualified to determine the credibility or lack of credibility of both eyewitness versions. The jury was able to do this with no less capacity than if it had been instructed that it might consider as substantive evidence the witnesses' original denials of any knowledge of the crime. We thus conclude that there is no merit to defendant's contention that the trial court erred in its instructions to the jury. By saying this, we do not create a general rule that the Model Charge on inconsistent statements should not be used. To the contrary, that instruction should as a rule be given whenever appropriate, and the present facts merely illumine a limited exception to the rule in a particular factual context.

IV
Except to the extent we have already discussed defendant's contentions in the opinion, we have concluded that his other points are without sufficient merit to warrant discussion in a written opinion and we affirm pursuant to R. 2:11-3(e)(2). Finally, we note that defendant acting pro se wrote a letter to a judge of this Court who was not assigned to the case, in which defendant expressed a desire to assert issues pertaining to an alleged denial of the right to a speedy trial. No record with respect to those issues was furnished to us, and counsel at oral argument stated that they were unaware of any such record having been made. In the absence of a record, it would be inappropriate for us to attempt to decide the alleged speedy trial issue, but defendant can assert that issue in an appropriate petition for post-conviction relief if he chooses. See State v. Preciose, 129 N.J. 451, 609 A.2d 1280 (1992).
The judgment and sentence appealed from are affirmed.