**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4177-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY M. HARRIS,

    Defendant-Appellant.

_____

> Submitted February 9, 2022 – Decided August 31, 2022
>
> Before Judges Gilson, Gooden Brown and Gummer.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 18-09-1246.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Anderson D. Harkov, Designated Counsel, on the brief).
>
> Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After defendant's first trial resulted in a hung jury, defendant was re-tried before a second jury and convicted of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1); possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1). He was sentenced to an aggregate extended term of fifty years of imprisonment, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

The convictions stemmed from a shooting during a fistfight that resulted in the death of an onlooker. Although ballistics evidence showed that multiple weapons had been fired, the victim was likely killed by three shots fired from a single .38 caliber weapon, and the State produced three witnesses who implicated defendant. The three witnesses, two of whom were only forthcoming after their own arrests on unrelated matters, gave conflicting testimony on certain points, and one of the witnesses did not identify defendant in the courtroom.

On appeal, defendant raises the following points for our consideration:

> POINT ONE
>
> THE COURT ERRED WHEN IT FAILED TO GRANT DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL, MADE AT THE

2

END OF THE STATE'S CASE AND AS PART OF HIS MOTION FOR A NEW TRIAL AFTER THE VERDICT.

POINT TWO

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO INSTRUCT THE JURY WHAT WAS AND WAS NOT EVIDENCE, AND AS A CONSEQUENCE OF THE COURT'S ERROR THE JURY CLEARLY CONSIDERED PREJUDICIAL INFORMATION THAT WAS NOT IN EVIDENCE WHICH SHOULD HAVE RESULTED IN A MISTRIAL.

POINT THREE

THE NUMEROUS OMISSIONS OF CRITICAL COMPONENTS OF THE JURY INSTRUCTIONS DIVERTED THE JURY'S FOCUS FROM THE PITFALLS AND GAPS IN THE STATE'S CASE AND DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL. (NOT RAISED BELOW).

A. The Trial Court Committed Reversible Error When It Failed To Instruct The Jury What Was And Was Not Evidence.

B. Despite The Fact That Five Witnesses Were Examined By Both Sides On Prior Inconsistent Statements, The Court Failed To Instruct The Jury That Such Statements Can Be Considered By The Jury As Affecting The Witnesses' Credibility.

C. The Failure Of The Trial Court To Give A Causation Charge Tailored To The

3

Facts Of This Case Steered The Jury Away From Defendant's Version Of The Facts And Was Highly Prejudicial.

D. Despite Repeated References To Defendant's Photograph Being Shown To Witnesses By Law Enforcement The Trial Court Failed To Give The Model Charge On Police Photographs.

POINT FOUR

THE ERRONEOUS AND ONE[-]SIDED SUMMARY OF THE EYEWITNESS TESTIMONY DURING THE COURT'S JURY INSTRUCTIONS, COMBINED WITH [ITS] REPEATED OMISSIONS OF JURY CHARGES THAT SUPPORTED THE DEFENSE VERSION OF THE CASE, EXPOSED THE COURT'S BIAS IN FAVOR OF THE PROSECUTION TO THE JURY, THUS DEPRIVING DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

POINT FIVE

ON TWO OCCASIONS THE COURT ALLOWED THE STATE TO IMPEACH ITS OWN WITNESSES WITH PRIOR INCONSISTENT STATEMENTS WITHOUT CONDUCTING A HEARING OUTSIDE THE PRESENCE OF THE JURY, PURSUANT TO N.J.R.E. 104, THUS DEPRIVING DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.  (NOT RAISED BELOW).

POINT SIX

AS A RESULT OF THE CUMULATIVE EFFECT OF THE ERRORS RAISED IN POINTS ONE

THROUGH FIVE, SUPRA, DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL. (NOT RAISED BELOW).

POINT SEVEN

THE SENTENCE IMPOSED BY THE TRIAL COURT CONSTITUTED AN ABUSE OF DISCRETION BECAUSE IT IMPOSED A DISCRETIONARY EXTENDED TERM AFTER THE STATE FILED AN INVALID NOTICE AND BY IMPOSING A SENTENCE THAT WAS EXCESSIVE, REQUIRING DEFENDANT'S SENTENCE BE VACATED AND THE CASE REMANDED TO THE TRIAL COURT FOR A NEW SENTENCE HEARING.

A. The State's Notice Of Motion For An Extended Term Violated [Rule] 3:21-4e.

B. The Sentence Imposed By The Trial Court Was Excessive.

We find sufficient merit in defendant's challenge to various aspects of the jury charge to require reversal of defendant's convictions.

I.

We glean the following facts from the seven-day trial conducted on various dates in October 2018, during which the State produced twelve witnesses, consisting of civilian and law enforcement witnesses, including crime scene investigators, a ballistics expert, and a medical examiner.

At about 7:00 p.m. on September 21, 2016, a group of individuals gathered to watch a fistfight on Zinc Street, an alleyway between Second and Third Streets in Florence Township. At some point, gunshots rang out, and the victim, Ronald Walker, was shot. Florence Township police responded to calls for assistance, as did paramedics who treated Walker at the scene and transported him to the hospital, where he died from injuries sustained from three gunshot wounds. The medical examiner recovered two bullets and several bullet fragments from Walker's body and identified "two exit wounds." Law enforcement officers also recovered numerous shell casings near the crime scene.

Police interviewed several people on the night of the shooting. However, the people interviewed were generally uncooperative and would not tell the police what they saw, or who was involved in the shooting. Nonetheless, the investigation uncovered evidence pointing to defendant as the shooter and, at trial, the State produced three witnesses who testified they had observed defendant at the fight in possession of a gun – Rasheed Johnson, the victim's coworker and friend; Dontae Walker, the victim's brother; and Najhee Cox, the victim's friend.

6

Johnson testified that on the day of the fight, he had worked with the victim and his brother, Dontae.[1]  After work, they spent time together at an apartment near West Second Street before walking toward West Third Street, through the alleyway, where a fight broke out between two men.  As the fight was ending, Johnson observed defendant in the alleyway, standing near a brown fence.  Johnson had known defendant for a long time from growing up in Florence Township.  Johnson testified that defendant was wearing black clothing and holding a black gun which he pointed and fired in the direction of the victim.  However, on cross-examination, Johnson acknowledged that he did not know if defendant had pointed and fired the gun "at any particular person."  Johnson stated that "it could have been anyone that got hit."

Johnson testified that when he heard gunshots, he and everyone he was with started running toward West Second Street.  According to Johnson, there were about ten to fifteen people running.  Once he saw the victim collapse near a gate, he stopped running and stayed in the area until the victim was transported to the hospital.  Nonetheless, Johnson never spoke to the police about the shooting until about two months later, when he was arrested on an

---

[1]  We refer to Dontae by his first name to avoid confusion because he shares a surname with the victim.

A-4177-18

outstanding warrant. During the interview, Johnson told police what he saw and identified defendant from a photograph shown to him by the police. Johnson believed that giving a statement about the shooting facilitated his release from custody.

Dontae corroborated Johnson's testimony about working on the day of the shooting and hanging out after work with a group of friends and family. Dontae testified that after work, a "beef" developed between his brother's friend and "Nas and his cousin." However, no fight occurred at that time because Nas's group left. Later, when Nas's group returned, Dontae and his friends met up with some people and walked to the alleyway to watch the fight along with his brother. Dontae said there were two people fighting but everyone "just scattered" when gunshots were fired. While Dontae was running towards his house, he encountered his cousin Lameek, who told him his brother had been shot. When Dontae turned back and returned to the scene to find his brother, he saw a person holding a silver gun in his left hand and pointing it towards the ground. Dontae had never seen the man with the gun before that night and described him as fat, with a chubby face, a short haircut, and a beard. Although Dontae testified that he did not notice what the man was wearing, on cross-examination, he admitted that he had told police the

8

man holding the gun was wearing a grey hoodie and either grey sweatpants or blue jeans, but he was not sure.

After the shooting, Dontae described the person he had seen with the gun to "a couple people" who showed him some photographs. As a result, Dontae was able to identify the man with the gun as someone who went by the street name "Black." In court, Dontae identified defendant as Black, the man he saw holding a gun. Dontae testified that he did not see defendant shoot the gun, nor did he speak to defendant. According to Dontae, after people pulled defendant away from the scene, Dontae ran towards his brother, whom he saw lying face down in the street. Dontae "flipped" his brother over and waited until the ambulance arrived. Dontae did not initially cooperate with the police because "they don't do nothing," but later spoke to the police when his mother told him to do so. At trial, Dontae also confirmed that his criminal history included a felony conviction for a "[g]un charge" for which he served prison time.

Cox testified that on the date of the shooting, he was living on West Second Street in Florence Township and had hung out with friends on West Third Street after work. He observed a car pull up and someone jump out of the car and engage in an argument with another person. The person then got

9

back into the car and left, at which time Cox and his friends went to Zinc Street to relax, drink, and talk about work. Soon thereafter, a group of older men from Beverly arrived, and a fight broke out between Cox's friend Jahques and another person. Cox said that additional fighting broke out between some spectators, and, in response, his friend Daquan cocked a tan-colored airsoft gun.

Upon hearing gunshots, Cox ran with the victim in the direction of Second Street. Cox said he was close friends with the victim, who was "like a brother" to him. Cox testified he saw a heavyset man with a mini-Afro fire a gun twice – the first time was in the air and the second time the bullet ricocheted off the concrete. When Cox realized that the victim had fallen to the ground, with "blood gushing out of his mouth," he turned around and attempted to help him. Cox testified that he and others held the victim's head up and put pressure on the wound until the ambulance arrived.

Cox described the shooter as wearing a white T-shirt. Although Cox knew the shooter as a person named Anthony, who went by the street name Black, Cox did not identify defendant as the shooter at trial and testified that he did not see the shooter in the courtroom. When Cox denied any recollection of giving the police the name of the person he saw shooting a gun, the

10

prosecutor used his prior statement to police to refresh his recollection that he had told the police the shooter was a person named Black from Beverly and was related to someone named Nas. Cox was adamant, however, that he never recognized the shooter in either of the two photographs he was shown by police. On cross-examination, Cox acknowledged that detectives had questioned him about the shooting while he was in jail on a charge of criminal mischief. Although he denied that the detectives promised to get him out of jail if he spoke to them, he admitted that the detectives said they would speak to the judge for him.

Defendant's aunt, Laura Taylor, also testified for the State. She resided on West Third Street in Florence Township and confirmed that defendant went by the street name "Black." When she heard the gunfire and screaming, she went out onto her front porch and observed about fifteen to twenty people, including defendant, running out of the alleyway. Taylor was one of several people who called 9-1-1 to report the shooting. After making the call, Taylor walked into the alleyway and observed the victim laying on the ground, bleeding. At the time, the victim was being attended by his cousin Lameek and Taylor's niece, Michelle. When questioned by police later that night, Taylor lied, telling them that she had not seen defendant on the night of the

11

shooting. At trial, she testified that she had lied in order "to protect" her nephew.

The State also presented testimony from Cynthia Paton, who lived in a second-floor apartment on West Third Street, near the shooting. Paton testified that after hearing gunshots, she looked out her window. She observed approximately seven to ten people running from the scene and saw two hands and two guns, one black and one silver, "over [a] stockade fence." However, Paton did not know if the hands she saw belonged to one person or two different people. Paton stated it appeared as if one gun was being fired in the air because she saw a flash. Paton also recalled that one or both guns were pointed in the direction of the victim's home, which was on Second Street. Additionally, Paton testified that she had observed "a black man," dressed "all in black [clothing,]" run by her porch and discard what she believed to be a weapon in a trash bin. The man asked Paton if she had seen anything, and she responded that she had not. On cross-examination, Paton acknowledged that she did not know whether the man who ran past her was the same person she had seen holding a gun in the air. Paton also recalled seeing a shirtless black man who also might have had a gun.

12

Ballistics evidence showed that multiple weapons had been fired. Law enforcement officers recovered from the scene: (1) two .9mm blank rounds that had been discharged from the same gun; (2) three .9mm Luger shell casings that had been discharged from the same gun; and (3) a bullet discharged from a .38 caliber weapon, which may have come from the same weapon used to kill the victim because the markings on the bullet matched those on a bullet recovered from the victim's body. In addition, officers found a .40 caliber semiautomatic pistol, with eight bullets in the magazine and one in the chamber, in a recycling bin on Third Street, at the end of Zinc Street. However, that weapon was not connected with any shell casings or bullets found at the scene.

In summation, the prosecutor argued that there were three weapons at the scene: (1) the .40 caliber weapon found in the recycling bin; (2) the gun that shot the blank rounds; and (3) the .38 caliber weapon used to kill the victim. The prosecutor argued that the .9mm shell casings were related to the .38 caliber weapon used to kill the victim. In that regard, although the ballistics expert testified that bullets could not be matched to casings, he also testified that the .38 caliber bullet found at the scene could have been fired from a .9mm Luger cartridge.

13

At the close of the State's case, defendant moved for judgment of acquittal, see R. 3:18-1, but the motion was denied. Defendant did not testify or produce any witnesses. Following the return of the verdict, on the State's motion, the trial judge dismissed a fourth count charging second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1), which had been bifurcated for purposes of trial.

Post-trial, the State moved for an extended term sentence under N.J.S.A. 2C:44-3(a), which was granted, and defendant moved for a new trial, see R. 3:20-1, which was denied. The judge sentenced defendant to an extended term of fifty years in prison, subject to NERA, on the aggravated manslaughter conviction, and a concurrent term of seven years in prison, with forty-two months of parole ineligibility, on the unlawful possession of a weapon conviction. The remaining count was merged into the aggravated manslaughter conviction. On December 21, 2018, the judge entered a memorializing judgment of conviction and this appeal followed.

II.

On appeal, defendant's arguments focus mainly on the jury charge. Defendant argues he was deprived of a fair trial due to several errors in the jury charge and the judge's response to a jury question. Specifically, defendant

argues the judge erred by: (1) failing to adequately instruct the jury on what was and was not evidence, resulting in the jury considering prejudicial information that was not in evidence; (2) failing to give a charge on police photographs; (3) giving a one-sided summary of eyewitness testimony, exposing bias in favor of the State; (4) responding to a jury question asking whether defendant had a criminal record in a manner that contradicted the court's earlier instruction regarding consideration of Dontae's prior conviction; and (5) failing to give the model jury charge on prior contradictory statements.

Because defendant did not object to the jury charge or the response to the jury question in the trial court, we review for plain error and reverse only if the error was "clearly capable of producing an unjust result." State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2).

> In the context of jury instructions, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Camacho, 218 N.J. 533, 554 (2014) (quoting State v. Adams, 194 N.J. 186, 207 (2008)).]

Ordinarily, "[d]efendant is required to challenge instructions at the time of trial." State v. Morais, 359 N.J. Super. 123, 134 (App. Div. 2003) (citing R.

15

1:7-2). "Where there is a failure to object, it may be presumed that the instructions were adequate." Id. at 134-35 (citing State v. Macon, 57 N.J. 325, 333 (1971)). "The absence of an objection to a charge is also indicative that trial counsel perceived no prejudice would result." Id. at 135.

It is axiomatic that "[a]n essential ingredient of a fair trial is that a jury receive adequate and understandable instructions." State v. Afanador, 151 N.J. 41, 54 (1997); see also State v. Green, 86 N.J. 281, 287 (1981) ("Appropriate and proper jury instructions are essential for a fair trial."). "The [trial] judge 'should explain to the jury in an understandable fashion its function in relation to the legal issues involved.'" McKinney, 223 N.J. at 495 (quoting Green, 86 N.J. at 287). "The trial judge must deliver 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" Ibid. (quoting Green, 86 N.J. at 287-88).

When reviewing an alleged error in the jury charge, "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect," State v. Wilbely, 63 N.J. 420, 422 (1973), and "to determine whether the challenged language was misleading or ambiguous," State v. Nelson, 173 N.J. 417, 447

16

(2002). Further, in "assessing the soundness of a jury instruction," a reviewing court considers how ordinary jurors would "'understand the instructions as a whole,'" based upon "'the evidence before them, and the circumstances of the trial.'" State v. Savage, 172 N.J. 374, 387 (2002) (quoting Crego v. Carp, 295 N.J. Super. 565, 573 (App. Div. 1996)).

To be sure, the effect of any error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Indeed, "'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." State v. Bunch, 180 N.J. 534, 542 (2004) (quoting Nelson, 173 N.J. at 446). "'[B]ecause erroneous instructions on material issues are presumed to be reversible error,' our care in reviewing jury instructions is deep-seated and meticulous . . . ." State v. Lykes, 192 N.J. 519, 537 (2007) (first alteration in original) (citation omitted) (quoting State v. Lopez, 187 N.J. 91, 101 (2006)).

These same standards apply to our review of a trial court's response to a jury question. Ibid.

"We have recognized that although an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal." State v. Reddish, 181 N.J. 553, 615 (2004). This is such a case.

First, defendant argues the judge erred by omitting from the final instructions to the jury the definition of "evidence" that could be considered in judging the facts of the case contained in the model jury charge, which provides in pertinent part:

> Now I will move on to the second part of the instructions and discuss the evidence that you may consider in judging the facts of the case. When I use the term "evidence" I mean the testimony you have heard and seen from this witness box, any stipulations and the exhibits that have been admitted into evidence.
>
> [Model Jury Charges (Criminal), "Final Charge" (rev. May 12, 2014).]

To support his argument that he was prejudiced by the omission, defendant points to the following question submitted by the jury during deliberations: "Can we ask if [defendant] has a criminal record? If so, we are asking." Defendant asserts that the question indicates "[t]he jury was clearly

18

considering 'facts' not in evidence" and was ignoring the judge's instruction that it should draw no inference of guilt from defendant's failure to testify. Further, defendant contends the judge erred in his response to the jury question because after discussing the question with counsel, the judge instructed the jurors that "whether a person does or does not have a criminal record may play no part in a jury's determination of guilt or non-guilt and may play no part or be considered by you in your deliberations. It simply isn't relevant to the case." According to defendant, the response effectively told the jury that Dontae's criminal record was irrelevant to the jury's deliberations and contradicted the court's previous instruction that Dontae's prior conviction may be considered when assessing his credibility.

Although the State concedes the judge failed to define evidence in the final charge, it asserts that the judge's reference to evidence on separate occasions in various instructions throughout the trial cured the error. To be sure, we consider the charge as a whole. However, contrary to the State's argument, instructing the jurors on their obligation to weigh and assess the "evidence," or instructing the jurors that certain information, such as the indictment and comments made by the court and counsel, was not evidence,

19

without affirmatively defining what constituted "evidence," did not suffice to cure the error caused by the omission.[2]

The error was compounded by the judge's response to the jury question inquiring about defendant's criminal record. The question itself was indicative of the jury's speculation about matters not in evidence and underscored the prejudice caused by the judge's error in failing to affirmatively define the "evidence" the jury was permitted to consider. The response to the jury question was problematic because it contradicted the judge's prior instruction, which correctly told the jury that it could consider Dontae's prior conviction when assessing his credibility. The contradictory response was particularly damaging and cannot be excused on the basis of other overwhelming evidence

---

[2] The closest the judge came to defining "evidence" was in the charge on identification, when the judge instructed the jury:

> [Y]ou may consider the factors the [c]ourt has just discussed with you and assess all of the circumstances of the case, <u>including all of the testimony and documentary evidence</u> in determining whether a particular identification made by a witness is accurate and is, thus, worthy of your consideration in deciding whether the State has met its burden to prove identification beyond a reasonable doubt.
>
> [(emphasis added).]

of guilt in light of the circumstantial nature of the State's case, which depended heavily upon the credibility of the State's witnesses, including Dontae.

Defendant further contends that the judge erred by not giving the model jury charge on police photographs, despite repeated references to defendant's photograph being shown to witnesses by law enforcement. He asserts that if the judge had read the model charge, "[t]his could have avoided the prejudice of the jury considering defendant's prior record."

The record reflects that law enforcement showed photographs to two witnesses – Johnson, who identified defendant from a photograph, and Cox, who did not. The photograph that Johnson identified as defendant was admitted into evidence upon the State's application. The photographs shown to Cox were not shown to Cox at trial nor were they admitted into evidence. Defendant did not request a charge on police photos, nor was one given by the judge. However, in the final charge, on two occasions, the judge referenced Johnson having identified defendant from a photograph shown to him by the police.

The model jury charge on police photos states:

> There are in evidence photographs that were used to identify the defendant in this case.

With reference to the photographs submitted into evidence, you will notice that many or all of the photographs appeared to have been taken by a law enforcement agency, or some other government entity.

You are not to consider the fact that the agency obtained a photograph of the defendant as prejudicing him/her in any way. The photographs are not evidence that the defendant has ever been arrested or convicted of any crime. Such photographs come into the hands of law enforcement from a variety of sources, including but not limited to driver's license applications, passports, ABC identification cards, various forms of government employment, private employment requiring state regulation, including but not limited to casino license applications, security guard applications, etc., or from a variety of other sources totally unconnected with criminal activity.

[Model Jury Charges (Criminal), "Identity – Police Photos" (rev. Jan. 6, 1992).]

The model charge is intended to prevent jurors from considering photos used by law enforcement in identification procedures as evidence of a defendant's criminal history. In State v. Swint, 364 N.J. Super. 236, 239-43 (App. Div. 2003), we found prejudicial error in the trial judge's failure to issue a charge on police photos where defense counsel requested such a charge and jury questions about the photos indicated the jury's consideration of whether the defendant had a criminal history. In reversing the defendant's convictions

for attempted murder, robbery, aggravated assault, and related weapons offenses, we stated:

> Here, the jury was obviously concerned about the "criteria" used to select the photos shown to the victims. The legal concern is that police photos suggest the inadmissible postulate that defendant had a criminal history, may have been suspect for that reason, and the jury may then find him guilty on the same basis. The Model Charge is designed to neutralize that prejudice.
>
> In a case such as this where the sole issue was identification and that, in turn, was influenced by whether defendant's alibi was credible, we cannot say the error was harmless.
>
> [Id. at 243 (citations omitted).]

Here, because identification was a material issue in the case that was, in turn, influenced by witness credibility, the judge clearly erred by not issuing a charge on police photos. Moreover, the error was prejudicial. Without the charge, the jury was left to speculate about defendant's criminal history, which it clearly did as evidenced by its question whether defendant had a criminal record.

Defendant also contends that the judge gave an erroneous and one-sided summary of the eyewitness testimony in the identification charge. Defendant

23

asserts the error exposed the judge's bias in favor of the prosecution and deprived him of his constitutional right to a fair trial.

"[T]he trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as he clearly leaves to the jury . . . the ultimate determination of the facts and the rendering of a just and true verdict on the facts as it finds them."  State v. Mayberry, 52 N.J. 413, 439 (1968); accord Reddish, 181 N.J. at 612; State v. Ramseur, 106 N.J. 123, 280 (1987). "But when a court delves into the facts, 'any comment must be designed to avoid unduly influencing or otherwise invading the province of the jury.'" Reddish, 181 N.J. at 612-13 (quoting State v. Biegenwald, 106 N.J. 13, 44 (1987)); see, e.g., State v. Concepcion, 111 N.J. 373, 381 (1988) ("By selectively interpreting its charge to the jury in relation to one aspect only of the critical events, the trial court may have misled the jury and influenced it to return a guilty verdict based solely on that conduct.").

> Thus, with respect to the relative strengths and weaknesses of the evidence . . . such arguments more properly emanate from counsel.  If, however, a court finds it necessary to comment on the strengths of one party's case, it must refer to the opponent's counterarguments; conversely, if weaknesses are discussed, the countervailing explanations must be mentioned.
>
> [Reddish, 181 N.J. at 613 (citations omitted).]

See also State v. Robinson, 165 N.J. 32, 45 (2000) ("[I]f the court refers to the State's evidence in any significant way, it must also refer to the defendant's contrary contentions.").

"The trial judge is the symbol of experience, wisdom and impartiality to the jury and, as such, must take great care that an expression of opinion on the evidence should not be given so as to mislead the jury." State v. Zwillman, 112 N.J. Super. 6, 20-21 (App. Div. 1970). The judge "must not throw his [or her] judicial weight on one side or the other." Id. at 21; see also State v. Guido, 40 N.J. 191, 208 (1963) ("The trial judge is an imposing figure. To the jurors he is a symbol of experience, wisdom, and impartiality. If he so intervenes as to suggest disbelief, the impact upon the jurors may be critical.").

Here, in giving the identification charge, the judge summarized the identification testimony of three witnesses as follows:

> The State has presented the testimony of witnesses who identified the defendant in court.
>
> Dontae Walker, who testified that he did not know the defendant prior to the shooting, but identified him in court.
>
> Rasheed Johnson, who testified that he knew the defendant since he was five or six years old and that he saw the defendant fire the gun and that he

25

identified the defendant in a photograph to police and identified him here in court.

And Najhee Cox, who identified him in a statement to police as Black but did not identify him in court.

Later in the identification charge, the judge also stated:

You may consider the confidence and accuracy of the witness. You heard testimony that Rasheed Johnson made a statement at the time he identified the defendant from a photograph concerning his level of certainty that the person in the photograph he selected is, in fact, the person who committed the crime.

Defendant asserts the judge failed to mention that Dontae did not see defendant shoot a gun and testified that defendant was holding a silver gun, while Johnson testified that defendant was holding a black gun; inaccurately implied that only one gun was fired when the evidence showed that multiple guns had been fired; failed to mention that Johnson could not tell where defendant was pointing the gun and did not see defendant shoot the victim; told the jury that Johnson had "identified the defendant from a photograph" as "the person who committed the crime" when all Johnson testified to was that he identified defendant in a photograph shown to him by the police; and gave a summary of Cox's testimony that was "simply not true."

The summaries were problematic in certain respects. The judge's summary of Dontae's testimony was accurate but incomplete because, as noted by defendant, it did not point to the weaknesses in Dontae's identification. Nevertheless, the incomplete summary of his testimony was not so prejudicial as to constitute plain error. See Robinson, 165 N.J. at 43 (finding no plain error in the trial court's identification charge, which failed to point out weaknesses in the State's identification evidence).

On the other hand, the judge's summaries of Johnson's and Cox's testimony were both inaccurate and incomplete. Contrary to the judge's instruction, Johnson never identified defendant "from a photograph" as "the person who committed the crime."[3] Instead, Johnson testified that he had identified defendant in a photograph shown to him by the police. The prosecutor never asked if he identified defendant to the police as the person he saw shooting a gun, let alone "the person who committed the crime."

Moreover, although Johnson testified that he saw defendant shoot a gun in the alleyway, he conceded that he could not say for sure whether defendant

---

[3] This language appears in Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020), which refers to witnesses identifying the defendant "as the person who committed" the offense. However, that language was inapplicable to the facts of this case, where no witness testified to having seen defendant shoot the victim.

was pointing the gun at any particular person. Although the jury was entitled to infer from Johnson's testimony that defendant had shot and killed the victim and that he was "the person who committed the crime," the judge erred by making that inference on the jury's behalf. See Reddish, 181 N.J. at 613-16 (finding the jury charge improper because of the "instruction's one-sided picture of the evidence" and the trial court's failure "to point to evidence and arguments that favored defendant" which "left the jury with an impermissibly unbalanced commentary on the evidence").

Similarly, contrary to the judge's summary, Cox never identified defendant as Black, nor did he identify defendant in his statement to the police. Rather, Cox testified that the person he observed shooting a gun was a person named Anthony, who went by the street name Black. He also acknowledged telling the police that the person he observed shooting a gun was a person named Black, from Beverly, who was related to a person named Nas. However, Cox also testified that he never identified anyone from the photos the police had shown him, and he did not see the shooter – the person he knew as Anthony a/k/a Black – in the courtroom.

Again, although the jury was entitled to infer from Cox's testimony that defendant, whom other witnesses had testified went by the street name Black,

was the person Cox had observed shooting a gun, the judge erred by making that inference on the jury's behalf, particularly since the jury could also have inferred from Cox's failure to identify defendant in the courtroom that defendant was not the person whom Cox had observed shooting a gun. Thus, through his mischaracterization of Cox's testimony, the judge erred in making an inference favorable to the prosecution and prejudicial to the defense. See id. at 615 ("The court had an independent duty to ensure that the jurors received an accurate instruction on the relevant law and, when necessary, a balanced assessment of the facts to allow them to apply that law. In failing to fulfill that obligation, the court erred.").

At trial, defendant did not object to the judge's summaries of Dontae's or Johnson's testimony. However, defendant objected to the judge's proposed instruction that Cox identified defendant as "Black from Beverly," maintaining that Cox had "never said that's Black from Beverly when . . . talking about [defendant,]" and never identified defendant in court nor in any photos shown to him by the police. The judge overruled the objection.

Notably, in summation, defense counsel addressed the weaknesses in the State's case. Additionally, in the final charge, the judge instructed the jurors that their understanding of the evidence was controlling and comments on the

29

evidence made by the court and counsel were not "binding" on the jury and were to be "disregard[ed]" in the event of a conflict. See State v. Rudd, 49 N.J. 310, 314 (1967) ("The trial judge had the right to comment on the evidence so long as he clearly and fairly" told the jury it "was not bound by his comment and could properly disregard it if it [saw] fit."). The jury appears to have heeded the warning because during deliberations, the jury requested and received read backs of the testimony of Dontae, Johnson, and Cox.

If the judge's incomplete and, in some cases, inaccurate characterizations of the identification testimony were the only error, we might find no basis for appellate intervention. However, "[t]he combined impact of these errors does not permit us to conclude that the cumulative error was harmless beyond a reasonable doubt, therefore, a new trial is required." State v. Weaver, 219 N.J. 131, 162 (2014). Given the stature of the judge, the necessity for correct jury instructions, the circumstantial nature of the State's case, and the importance of the identification testimony and witness credibility in general, the errors, when considered cumulatively with the other errors in the jury charge to which we have adverted, warrant reversal of defendant's convictions. See State v. Orecchio, 16 N.J. 125, 129 (1954) ("Where . . . the legal errors are of such magnitude as to prejudice the defendant's rights or, in their aggregate have

30

rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury.").

We apply a similar analysis to defendant's contention that the judge committed reversible error when he failed to give the model jury charge on witnesses' prior contradictory statements, and failed to identify the five State witnesses unaffiliated with law enforcement who gave prior inconsistent statements, namely, Taylor, Paton, Johnson, Cox, and Dontae. See Model Jury Charges (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (May 23, 1994).

It is undisputed that the judge did not give the model jury charge on prior contradictory statements. However, the judge instructed the jury on assessing witness credibility, including considering prior inconsistent statements, as follows:

> How do you evaluate the testimony of witnesses? When considering the testimony of witnesses the [c]ourt suggests to you that you may wish to take into account the following.
>
> The interest or lack of interest that any witness has in the outcome of the case; the bias or the prejudice of a witness, if any; the witness' mental capacity for knowing that about which he or she speaks. You may consider any prior inconsistent statements or any discrepancies in the testimony of a witness; the reasonableness or unreasonableness of the

31

testimony; the manner in which the witness testified on the stand; the demeanor of the witness; the witness' willingness or reluctance to answer questions and you may consider the inherent believability or lack thereof of the testimony presented.

In weighing the effect of a discrepancy you may consider whether it relates to a matter of importance or to a matter of unimportant detail. You may consider whether it results from innocent error or willful falsehood.

If you believe that any witness testified falsely concerning any material fact and did so with a purpose to deceive you, you may give to that witness' testimony whatever weight you deem it is entitled. You may, in your discretion, disregard all of the testimony of that witness or you may choose to accept some portion of the testimony and reject other parts.

You may also consider any explanation that a witness may offer to explain a discrepancy in the testimony offered. And you may, of course, accept all of the testimony of any witness.

In so many words the [c]ourt has just said to you that an inconsistent statement may be used as proof of the truth of the facts stated therein.

Now what does that mean? That's a mind bender. It's best explained by way of a rather simple example.

Let's suppose there's a driver of a vehicle. He's in front of the courthouse here going up Rancocas Road toward the intersection with High Street, which is controlled by a traffic light. He's involved in a collision. A police officer arrives on the scene within

32

a minute of the accident.  And he says to the police officer, officer, for me as I entered the intersection the light was red.

Four months later he comes into this courtroom, sits on this witness stand and looks all of you in the eye and he says for me as I entered the intersection the light was green.

We now have inconsistent statements.  The one to the police officer that it was red; now here in court it's green.  What are your choices when you're faced with inconsistent statements?  They are three.

In the first instance you may believe that the statement given to the police officer within a minute of the accident before there was time for fabrication represents the truth and you will find that the light was red.

The second possibility is that the witness has given you an explanation for his confusion at the time when he spoke to the police officer and you accept that explanation.  You may find then that the light was green.

The third possibility is that, at least based on that witness' testimony, you find it so unreliable that you can make no finding as to the color of the light. They are your choices if you are faced with inconsistent statements.

In essence, the charge combined elements of <u>Model Jury Charges (Criminal)</u>, "Criminal Final Charge" (rev. May 12, 2014) (addressing the credibility of witnesses), <u>Model Jury Charges (Criminal)</u>, "False in One –

33

False in All" (rev. Jan. 14, 2013), and Model Jury Charges (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (May 23, 1994). Defendant did not object to the charge.

In State v. Hammond, 338 N.J. Super. 330, 339 (App. Div. 2001), we addressed a trial court's failure to give the model charge on "prior inconsistent statements made by the State's two key eyewitnesses." Prior to trial, the two witnesses had given statements to the police "that they knew nothing about the homicide." Id. at 340. At trial, however, "both witnesses recanted these initial statements . . . and testified that they in fact had witnessed the defendant fire at least two shots into the victim." Id. at 340-41. Over defense counsel's objection, the trial court did not issue the model jury charge on prior contradictory statements. Id. at 339-40. Instead, the court provided the jury with the "standard instructions regarding witness credibility" and did not specify that the jury "could use the prior inconsistent statements to assess the witnesses' credibility and as substantive evidence." Id. at 341. Nevertheless, we found that, as a whole, the jury charge was adequate to enable the jury to evaluate and make determinations regarding the key witnesses' prior inconsistent statements, particularly in light of defense counsel's "vigorous arguments" on credibility, and the fact that the witnesses' prior inconsistent

34

statements were "blanket denial[s] of any knowledge of the crime, rather than an alternative version of the crime scenario." Id. at 341-43.

Summarizing our holding, we stated:

> [T]he out-of-court prior inconsistent statements that are before us here lack any significant substantive exculpatory value that is pertinent to the jury instructions whose omission defendant challenges. The inconsistency arises from the witnesses' total disavowal to the authorities of any knowledge of an incident, in contrast to their testimony at trial in which they recounted the incident in detail. In these particular circumstances, because the import of the out-of-court prior inconsistent statements went solely to the issue of credibility and they had no substantive exculpatory value of their own that is relevant to the jury instruction on prior inconsistent statements of witnesses, such an instruction was not needed to protect defendant's rights. On the contrary, we are satisfied that the jury, as instructed on credibility by the court, and as informed by its common sense and relevant life experience, was fully qualified to determine the credibility or lack of credibility of both eyewitness versions. The jury was able to do this with no less capacity than if it had been instructed that it might consider as substantive evidence the witnesses' original denials of any knowledge of the crime. We thus conclude that there is no merit to defendant's contention that the trial court erred in its instructions to the jury.
>
> [Id. at 343.]

We cautioned, however, that we were "not creat[ing] a general rule that the Model Charge on inconsistent statements should not be used. To the contrary,

35

that instruction should as a rule be given whenever appropriate, and the present facts merely illumine a limited exception to the rule in a particular factual context." Id. at 343-44.

In contrast, in State v. Allen, 308 N.J. Super. 421, 427-28, 431-32 (App. Div. 1998), we found cumulative and plain error in the jury charge, warranting reversal of the defendant's drug related convictions, where the trial court did not give the full charge on credibility or a charge on prior contradictory statements or deliberation and "the issue of credibility" was "the keystone to the defense." We noted "[t]he court [was] obligated to inform the jury of the criteria necessary for jurors to judge the credibility of the witnesses who testify before them" because even if "the inconsistencies are of limited probative value, . . . they still raise issues as to credibility which must be considered by a jury in determining the ultimate issue in the case." Id. at 428-29. We concluded that because "[t]he charges complained of [were] part of the 'standard' charge and absent a substantial basis should have been charged," the "failure to charge" constituted "plain error." Id. at 432 (citing R. 2:10-2).

Here, in Taylor's prior statement to the police, she denied that defendant was present in the alleyway on the night the victim was killed. At trial, however, she testified to seeing defendant run from the alleyway, thereby

placing him at the scene of the crime. Thus, Taylor's prior inconsistent statement was of the nature addressed in the model jury charge and had significant substantive exculpatory value. On the other hand, the statements given by other witnesses were not so clearly inconsistent with their trial testimony or exculpatory for defendant. For example, Dontae's statement to the police and his trial testimony were fuzzy about whether he had noticed the shooter's clothing. Some witnesses' prior statements, like Johnson and Cox, were merely given reluctantly, after their own arrests. Other witnesses, such as Paton and Cox, merely had to have their recollections refreshed by their prior statements to the police.

Common to all the witnesses' prior statements was that the prior statements related to the witnesses' overall credibility, which was a key issue in the case. For that reason, the judge should have given the entire model jury charge on prior contradictory statements. The model charge is more thorough than the charge given by the judge and requires the judge to identify the trial witnesses who gave prior contradictory statements. However, as in Hammond, defense counsel thoroughly addressed the credibility of witnesses in his summation. Moreover, unlike Hammond, the judge gave a charge that drew,

37

in part, from the model charge on prior contradictory statements and there was no objection to the judge's failure to issue the entire model charge.

Standing alone, we might not find plain error in the judge's failure to give the entire model charge. However, in light of the previously discussed errors in the jury charge, the failure to issue the model charge on prior contradictory statements takes on greater significance and, when considered cumulatively with the other errors, warrants reversal of defendant's convictions. "When legal errors cumulatively render a trial unfair, the Constitution requires a new trial." Weaver, 219 N.J. at 155. "This is a classic case of several errors, none of which may have independently required a reversal and new trial, but which in combination dictate a new trial." Id. at 162.

Based on our decision, we need not address defendant's remaining arguments in any detail. Briefly, we reject defendant's argument that the judge committed plain error by failing to give a causation charge that was tailored to the facts of the case. The judge gave the model jury charge which courts are instructed to use "[i]f causal relationship between conduct and result is not an issue," as was the case here. See Model Jury Charges (Criminal), "Aggravated Manslaughter (N.J.S.A. 2C:11-4(a))" (rev. Mar. 22, 2004).

We also reject defendant's contention raised for the first time on appeal that the judge erred by allowing the State to impeach its own witnesses, Paton and Cox, without conducting a N.J.R.E. 104 hearing outside the presence of the jury. Contrary to defendant's argument, the State merely used Paton's and Cox's prior statements to the police to refresh their respective recollections. Therefore, no hearing was necessary. See State v. Carter, 91 N.J. 86, 122 (1982) ("Once a proper foundation has been laid, a witness may examine any document to refresh his memory.").

Finally, notwithstanding the circumstantial nature of the State's case, giving the State the benefit of all favorable inferences drawn from the evidence, the judge properly denied defendant's motion for judgment of acquittal, made at the end of the State's case and as part of his motion for a new trial after the verdict. See State v. Lodzinski, 249 N.J. 116, 143-44 (2021) (delineating standards governing motions for judgment of acquittal pursuant to Rule 3:18-1 and Rule 3:18-2); see also State v. Dancyger, 29 N.J. 76, 84 (1959) (stating that criminal conviction may be based solely upon circumstantial evidence).

In sum, defendant's convictions are reversed, and the matter is remanded for a new trial. Given our disposition, we do not need to address defendant's sentencing arguments.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION